# In the United States Court of Federal Claims

No. 08-757C
(Filed October 18, 2010)
TO BE PUBLISHED

|  |  |
|---|---|
| _____ )<br><br>UNITED CONSTRUCTORS, LLC,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>　　　　　　　Defendant.<br>_____ ) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Type I differing site condition claim; FAR 52.236-2(a); implied representation by Forest Service of actual site condition; foreseeability by contractor of actual site condition; constructive acceleration claim |

William J. Braun, Braun & Melucci, LLP, La Jolla, California, for plaintiff.

Jeffrey A. Regner, Trial Attorney, Karen V. Goff, Trial Attorney, Martin F. Hockey, Jr., Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

United Constructors ("United") alleges that it is entitled to additional compensation for removal of certain rocks it encountered on a construction site at the Fallen Leaf Lake Campground in South Lake Tahoe, California, as well as for delays to its work it contends were caused by the U.S. Forest Service. After trial, the court concludes that plaintiff has not demonstrated entitlement to the requested equitable adjustments and therefore directs entry of judgment in favor of defendant.

I.      **Background**[1]

United is the most recent in a series of construction companies owned and operated by Bud Barnes and his sons, including Jim Barnes.  Trial Transcript at 42-49 (docket entries 61-69, filed June 9 & 10, 2010) ("Tr.").  Previous Barnes-related entities engaged in a wide range of construction projects, mostly involving underground utilities.  *Id*. at 43-49.

After its formation in 2005, the first project upon which United bid was phase one of the construction of the Fallen Leaf Lake Campground Water System Improvement Project located within the Lake Tahoe Basin Management Unit in South Lake Tahoe, California.  *Id*. at 307; Compl. ¶¶ 1-4 (docket entry 1, Oct. 23, 2008).  The principal requirements of the contract were: (1) replacing an old water storage tank with a new, larger tank; (2) replacing approximately 1,600 linear feet of underground water main and smaller utilities from the new tank down to Fallen Leaf Lake Road (the "utility trench"); (3) placing a non-contiguous section of fourteen-inch water line underneath a nearby highway, Highway 89 (referred to as the "jack and bore" project because a hydraulic jack was used to propel the boring equipment under the highway); and (4) installing a pressure-reducing station at a third location on the campground.  Joint Exhibit ("JX") 1 at 5.

    A.      *Contract Terms and Site Visit*

United seeks compensation for a "Type I" differing site condition based upon a claim that a "subsurface or latent physical condition" existed at the site which "differ[ed] materially from those indicated in this contract."[2]  FAR § 52.236-2(a)(1).  United contends that the bid documents indicated that the amount of "smaller boulders"—rocks larger than three inches in diameter but possessing a volume smaller than one-half cubic yard—to be encountered in excavating the utility trench would be approximately one percent of the total excavation.  Because the percentage of smaller boulders was substantially higher than one percent, United contends that it is entitled to compensation due to a Type I differing site condition.[3]  Several provisions of the contract are pertinent to these allegations.

-----

[1] This recitation of facts sets forth certain of the Court's findings of fact in accordance with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC").  Additional findings of fact and rulings on mixed questions of fact and law are set forth in later sections of this Opinion and Order.

[2] Plaintiff has occasionally appeared to assert a Type II differing site condition claim, that is, that there were "unknown physical conditions at the site, of an unusual nature, which differ[ed] materially from those ordinarily encountered" in this type of work.  FAR § 52.236-2(a)(2).  In its final brief, however, plaintiff definitively disclaimed any reliance on a Type II differing site condition.  Plaintiff's Closing Reply Brief at 4-5 (docket entry 72, Aug. 16, 2010) ("Pl.'s Response").

[3] As will become clear, this case revolves in part around how to measure the volume of rocks, in the form of boulders, excavated from the site.  The most pertinent measurement is a cubic yard (that is, the volume of a cube with sides one yard in length).  Because boulders do not

The bid documents incorporated FAR clauses 52.236-2, Differing Site Conditions,[4] and 52.236-3, Site Investigations and Conditions Affecting the Work,[5] and thus "urged and

---

naturally form in perfect geometrical shapes, accurate measurement of the volume is very difficult. The most accurate method, which no one advocates, is submerging each rock in a gigantic tank of water and measuring the volume of displaced water. The parties dispute whether the proper imperfect alternative is to measure the diameter of the rock and determine volume as if the boulder were a sphere, or to measure the length, width and height, measuring volume as if it were a cube. Tr. at 135 (testimony of Bud Barnes advocating sphere method); *id.* at 192 (testimony of Jeffrey W. Turner advocating cube method).

[4] FAR § 52.236-2 reads:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) *subsurface or latent physical conditions at the site which differ materially from those indicated in this contract,* or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

*Id.* (emphasis added).

[5] FAR § 52.236-3 reads:

(a) The *Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost,* including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has *satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site,* including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. *Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating*

expected" offerors "to inspect the site where the work will be performed." JX 1 at 75. Further, the technical specifications included an agreement that "[u]pon beginning the earthwork, [the] Contractor represents that he has inspected the site and satisfied himself as to actual grades and levels and the true conditions under which the work is to be performed." JX 1 at 143.

The Forest Service held an optional pre-bid site visit on August 9, 2005, which was conducted by the Forest Service Contracting Officer Representative, Tom Torres. JX 4; JX 1 at 5; Tr. at 58. United did not attend that meeting. JX 4; Tr. at 494. While Mr. Torres did not recall the subject of the present dispute—the quantity of subsurface rock that would be encountered—being discussed at the meeting, he testified that "[i]t was obvious that there was plenty of rock on the ground and that folks would have seen it." Tr. at 497-98; *see also* JX 154-A; JX 154-B (contemporaneous photographs of site). Jim Barnes did not participate in the site visit because he felt he was sufficiently familiar with the area, and in preparing United's bid he relied upon knowledge he gleaned from having previously lived in the Lake Tahoe area and his experience with a construction project at the Truckee Tahoe Airport. Tr. at 307-08, 314-18. He also visited the site with the completed bid in hand immediately before submitting the bid to the Forest Service. JX 98 at 2; Tr. at 319.

The bid documents specified that "[i]f an item is not specifically mentioned, it shall be assumed to be included in the most appropriate bid item," and there are two bid items that could potentially encompass the utility trenching. JX 1 at 9, 82. The first possibility is bid item 2200(1), titled "Grading/Earthwork," which sought a price for "all work, materials, equipment, and labor for the grading and earthwork associated with the site improvements" to include "grading, excavating, backfill, compaction, disposal of surplus materials and all appurtenant work." JX 1 at 10. The pertinent statement of work, specification 2200, provided that:

> The work included under this section consists of all grading, excavation, backfilling, compacting, disposal of surplus material, and all other work incidental to the construction of retaining walls, slabs, trenches, walkway and roadway beds, and all other areas shown on the drawings and specified.

JX 1 at 143. Specification 2200 also called for "satisfactory removal and disposal of all materials encountered, regardless of the nature of the materials, the condition of the materials at the time they are excavated, or the manner in which they were excavated." JX 1 at 146.

The other possible placement for trenching costs was in bid item 2610(2), titled "14" Ductile Iron Pipe (DIP)," which asked the offeror to provide a price per foot for ductile iron pipe (later changed to high density polyethylene ("HDPE") through contract modification). JX 1 at 11-12; JX 121 at 2. This price per foot was to "include, but not be limited to, trenching,

---

> *properly the difficulty and cost of successfully performing the work, or proceeding to successfully perform the work without additional expense to the Government.*

*Id.* (emphasis added).

dewatering, bedding, backfilling, furnishing and installing all pipe . . . and all other appurtenant work necessary for complete installation of the pipe." JX 1 at 12. Specification 2610 defined the scope of work as including "furnishing all material, supplies, equipment, tools, transportation, and facilities, and performing all labor and services necessary for required connection with or incidental to furnishing and installing a complete domestic water system as described." JX 1 at 166.

These bid items "allowed [United] to include its pricing for excavation and backfill associated with the 14 inch pipe trench under at least two different bid items: 02200(1) ('grading/earthwork') or 02610(2) ('14" DIP')." Defendant's Proposed Findings of Fact and Conclusions of Law at 9 (docket entry 69, July 22, 2010) ("Def.'s Proposed Findings").

United asserts that it priced trenching under bid item 2610(2), but its argument for additional compensation relies heavily on a 2200 bid item, namely 2200(3), denominated "Inexcavatable Rock." Within the Excavation section, the Forest Service requested a price per cubic yard for "work, materials, equipment and labor to remove rock deemed inexcavatable by the Contracting Officer per the Specifications, by more substantial means such as blasting or hydraulic hammering. Work shall include but not be limited to hammering, drilling, placement of charges, blanketing, shooting and subsequent removal and disposal of rock."[6] JX 1 at 10. The estimated quantity of "inexcavatable rock" listed in the schedule of items was 25 cubic yards. JX 1 at 38.

Specification 2200 included definitions of "rock" and "rock excavating" that were later used to determine the scope of the "inexcavatable rock" provision;[7] that is, the Government

---

[6] It is undisputed, however, that United did no blasting or hydraulic hammering on the project. Tr. at 399. Although it is not at issue here, a strict reading of the "inexcavatable rock" provision would require use of those methodologies (or at least other "special equipment") to permit payment. *Id*. at 617 (testimony of David J. Brady) ("I felt a reasonable argument could be made that those half-cubic yard and greater boulders would not be considered inexcavatable rock if they weren't drilled and blasted, or special equipment was used to excavate them. But I felt that there was enough ambiguity in that description that I felt that we could give the contractor the benefit of the doubt, and pay the unit price for the inexcavatable rock for rock boulders larger than a half-a-cubic yard. . . ."). Jim Barnes testified that he brought in special construction equipment to deal with the rocks, *id*. at 399, although Contracting Officer Representative David Brady did not believe the equipment was "special." *Id*. at 675.

[7] Specification 2200 reads:

Rock Excavating:

    Rock: Material which cannot be removed with 3/4 cu. yd. capacity power shovel without drilling or blasting or solid boulders with a volume of more than ½ cu. yd.

interpreted the "inexcavatable rock" provision to require the Government to pay the per cubic yard rate for removal of boulders with a volume greater than one-half cubic yard.  Tr. at 617.  The Government ultimately increased the compensable quantity of "inexcavatable rock" from 25 cubic yards to 334 cubic yards.  JX 122 at 2; JX 125 at 2.  The crux of plaintiff's Type I differing site condition claim derives from plaintiff's interpretation of the estimate of 25 cubic yards of inexcavatable rock contained in the bid documents.  Specifically, United contends that because the contract represented that there would be 25 cubic yards of "inexcavatable rock," which the Government later interpreted to include boulders larger than ½ cubic yard in volume, United was entitled to assume that there would be a similar quantity of boulders smaller than ½ cubic yard in volume.

> **B.**     *Review of Offers and Award to United*

The Government received three bids for the Fallen Leaf Lake Campground project.  One of these was eliminated because it was not properly completed.  Tr. at 460-61.  Syblon Reid Construction, Inc. submitted a proposal priced at $1,401,167.44, including a $2,480 charge per cubic yard for inexcavatable rock.  JX 9 at 3-4.  United's total price was $843,884, with a $225 per cubic yard charge for inexcavatable rock.  JX 9 at 7-8.

The Forest Service determined that Syblon Reid's qualifications were exceptional, while United was initially evaluated as unacceptable and marginal.  Tr. at 461.  Contracting Officer Kathy Griffin contacted Bud Barnes to discuss her concerns with United's proposal.  *Id*. at 462.  She was troubled that the company was not represented at the pre-bid site visit meeting, but Bud Barnes explained that one of the company's superintendents had lived in and was familiar with the area.  *Id*. at 463.  Ms. Griffin informed him that the past performance references provided had been less than satisfactory, and he explained that in two of the three situations "there were 'Rock Refill' added costs that had to be negotiated."  JX 10 at 2; *see also* Tr. at 466.  She also discussed with him some low prices for individual items that concerned the Forest Service.  Tr. at 466-67.  Those discussions did not, however, involve the inexcavatable rock unit price, which was far closer to the $100 per cubic yard Government estimate than Syblon Reid's number.  *Id*. at 469-70.

Ms. Griffin further questioned United's proposed schedule for completing the work.  Due to restrictions imposed by the Lake Tahoe Basin Management Unit, no excavation work was permitted between October 15 and May 1.  JX 1 at 45.  Bud Barnes defended United's proposed schedule of work as follows:

---

> Rock Excavation: Material excavation of buried boulders and rock in excess of ½ cu. yd. that requires continuous and systematic drilling and blasting or continuous use of ripper or other special equipment.

JX 1 at 147.

> If you . . . issue the Notice to Proceed by [the end of September], we would have 15 days to install the Ring Wall for the water tank,[8] which the tank manufacturer guaranteed he could do, and we would have those same 15 days to trench the 1,534 feet, install the 14" ductile iron pipe and the two electrical conduits (in the same trench) and backfill and compact. There would be no problem for us to average 150 feet per day for the installation of these utilities, even if we encountered all 25 cubic yards of "Inexcavatable Rock" in this trench.

JX 10 at 1-2; *see also* JX 6 at 24.

Following the discussions and correspondence between Bud Barnes and Ms. Griffin, the Forest Service on September 28, 2005, awarded the contract to United. JX 13. United then subcontracted with Paso Robles Tank, Inc. ("Paso Robles") to construct and install the water tank. JX 5.

C.    *Commencement of Work*

United's second claim to compensation arises out of an alleged constructive acceleration of the work schedule. United contends that the Forest Service's post-award re-design of the water tank resulted in the utility trench work and the tank construction having to proceed at the same time. *See, e.g.*, JX 113 (reserving claim resulting from "three-month government-caused delay" that "caused both the tank crews and our crews to share the work site at the tank for a major period of time"). The Government maintains that United's schedules always unrealistically reflected simultaneous work on the utility trench and the tank, and that the re-design was at most a delay concurrent with United's failure to provide a sufficient geotechnical report, which was a prerequisite to installation of the tank. The changes in United's proposed schedules and the causes of the delays in accomplishing the work must therefore be reviewed in some detail.

The plan United set forth in Joint Exhibit 10, quoted above, stated that the trenching and the installation of the ring wall would occur during the same 15 days. However, this was physically impossible—digging the utility trench required excavating the road leading to the tank site, and that road was the only means of ingress to and egress from that site. The tank contractor, Paso Robles, would be unable to install the ring wall while trenching was occurring, and likewise there could be no trenching while the tank ring wall was being excavated and the concrete poured. *See, e.g.*, Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law at 9-11 (docket entry 71, Aug. 16, 2010) ("Def.'s Response"); *see also* Tr. at 704 (testimony of David J. Brady) ("[I]t was already apparent to everyone involved in the project that those two work items could not proceed simultaneously.").

---

[8] The "Ring Wall" is the circular poured concrete foundation upon which the water tank would be constructed. This foundation would have to be excavated before the concrete could be poured and allowed to "cure" for approximately ten days before the tank could be erected. Tr. at 414; JX 137.

After receiving the contract, United submitted a revised schedule acknowledging that the installation of the ring wall and utility trenching would not, as per its original proposal, be completed in the first fifteen days of October. JX 15 at 1. During those 15 days, United installed a road from the campground up a hill to the water tank site, "put in drainage control and . . . erosion control[, and] graded for the tank location" so that the tank manufacturer could begin work on May 15. Tr. at 360. During the winter moratorium, the tank manufacturer fabricated parts of the tank in its shops. *Id*. at 361.

The revised schedule stated that after the winter moratorium ended, between May 1 and May 30, 2006 "the tank manufacturer will install the Ring Wall for his water tank and we will install the utility trenches." JX 15 at 1. Defendant contends that this schedule again contemplates the trenching and the installation of the tank occurring simultaneously. Def.'s Proposed Findings at 20. Bud Barnes testified that he anticipated 15 days for the installation of the tank ring wall and 15 days to complete the trenching. Tr. at 268-69.

Four of the five subsequent bar-chart schedules plaintiff submitted to the Forest Service show the water tank construction and the utility trenching proceeding simultaneously. *See* JX 132 at 3; JX 134 at 3; JX 135 at 2; JX 136 at 2. The first four schedules do not distinguish between the installation of the ring wall and the erection of the tank, referring only to "Water Tank." *Id*. The fifth schedule, submitted in August 2006, does separate pouring of the ring wall, the curing of the ring wall, and the erection of the tank; but there is still some overlap between the erection of the tank and the installation of the 14" pipe. JX 137 at 1. United nonetheless contends that it *never* intended to install the utility trench during the installation of the water tank. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 8 (docket entry 70, July 23, 2010) ("Pl.'s Proposed Findings"). United cites only to Joint Exhibit 137 for this proposition, and does not explain its four preceding bar chart schedules, the schedule included in its original proposal, or the revised schedule submitted after it received the contract.

Project superintendent Jim Barnes testified that his plan was to begin the jack and bore installation of pipe under Highway 89 in May of 2006, while Paso Robles installed the tank. Tr. at 358. After the jack and bore project was complete and the tank had been installed, Mr. Barnes intended to return United's crew to the tank site and install the 14" pipe from the water tank down to the campground road. *Id*. at 359. But complications arose due to both United's delay in completing a satisfactory geotechnical report and to the Forest Service's design changes to the water tank.

1.   Geotechnical Report

The contract required United to provide a geotechnical report demonstrating that the soil at the proposed site would support a 420,000-gallon water tank. JX 1 at 21. The successful completion of this report was required before work on the tank, including the tank foundation, could begin. *Id*. United submitted a geotechnical report on November 29, 2005, JX 20, but the Forest Service rejected that submission on January 3, 2006. JX 22, 23. One problem was that United's engineer had only sampled the soil to a depth of six inches. JX 23 at 1; JX 22 at 10

("Due to the high percentage of cobble[9] and boulder present below the surface, a maximum depth of ½ feet below-ground-surface (bgs) was all the further the drill rig could penetrate before refusal.").

United submitted a revised geotechnical report on January 27, 2006. JX 25. This investigation again sampled soil only to a depth of six inches, the "furth[est] the drill rig could penetrate before refusal." JX 25 at 13. The Forest Service accepted this report with certain conditions, embodied in a February 28, 2006 work order. JX 28. United had to perform a new soil investigation "as soon as possible in the Spring of 2006" (presumably when the ground had sufficiently thawed) with "three test holes dug to at least a 4 foot depth and a specific soils profile." *Id.* If this new investigation "results in values that require a different foundation design, a new foundation design will be submitted with no change to contract time or price."[10] *Id.*

Because the report was otherwise approved, United was able to proceed with the tank foundation design. Def.'s Proposed Findings at 22. United excavated the geoengineering test pit on May 30, 2006, discovering "[n]othing but rock and boulder, and very little dirt."[11] Tr. at 347. On June 30, 2006, United's engineer completed the new soils analysis. JX 47. That information was forwarded to the Forest Service on July 7, 2006, JX 49, and approved on July 10, 2006. JX 54 at 2.

---

[9] The term "cobble" refers to "rounded or ragged stones between three and twelve inches in diameter." *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 698 (2007).

[10] In a late-arriving contention, United suggests that this requirement to dig to four feet was a constructive change to the contract. Even if that were so, no such claim was properly preserved, as counsel for United conceded at closing argument. Transcript of Closing Arguments at 52 (docket entry 77, Oct. 5, 2010) (contending that the delay in the report was not a separate constructive change claim, but was relevant "to the extent that . . . [i]t's a change that caused delay").

[11] United conducted further "potholing with excavator to determine how much rock will be in [the] excavation trench for [the] pipe" on June 20, 2006. JX 139-A at 19; Tr. at 658. United submitted a letter to the Forest Service on that same day requesting a change order to cover "Rock Refill" which was priced at $225 per cubic yard and

> includes the excavation in soils with a lot of rock, the separation of the rock from the suitable soils, hauling and disposing of the rock off site, the purchase of suitable soils to 'refill' the trenches and the voids left by the removed rocks, and hauling and filling the trenches with these imported soils.

JX 43 at 1. After potholing, United estimated that 25% of the material to be excavated was rock. *Id.* Bud Barnes considered this letter to constitute a request for payment both for boulders larger than ½ cubic yard and "those that didn't qualify and were smaller but still larger boulders." Tr. at 124-25, 127-28.

2.     Changes to the Tank Design

The earliest pre-advertisement designs of the water tank included cathodic protection and a recirculation system. Tr. at 514. Cathodic protection is a method of "inhibit[ing] tank corrosion through the placement in the tank of more easily corroded sacrificial anodes." Defendant's Memorandum of Contentions of Fact and Law at 6 (docket entry 51, Apr. 20, 2010) ("Def.'s Mem."). A recirculation system "is a pipe system installed inside the tank[,] which discourages freezing by causing the water in the tank to mix." *Id.* These requirements were not, however, included in the bid documents because "[t]he project had a limited budget, and we thought that it was more important to get the tank constructed and the pipeline installed from the [tank] down to the entrance to the campground." Tr. at 514.

After the October 1 start of the fiscal year, the Forest Service realized that it might be able to afford the cathodic protection and the recirculation system, and began discussing the addition of those items to United's contract by modification. *Id.* at 515. It was not until May 19, 2006, however, that the Forest Service asked United to provide a proposal to the Government for including cathodic and freeze protection in the tank design. *Id.* at 516; JX 35.

Bud Barnes testified that Paso Robles was prepared to begin the tank installation in May of 2006, but could not do so due to the design changes. Tr. at 105-06. He asserted that Paso Robles could not proceed with the ring wall foundation "because the circulating system as they had designed it went underneath the concrete ring wall." *Id.* at 106. Bud Barnes also testified that United was not authorized to proceed with the work until "the change orders have been issued and signed by both parties." *Id.* at 104; *see also id.* at 669.

On June 15, 2006, United sent a letter to the Forest Service containing its cost proposal for the additional work. *Id.* at 107; JX 42. By July 8, 2006, United and the Forest Service had reached agreement on the price to be paid for the cathodic and freeze protection. Tr. at 109; JX 40. On July 10, 2006, the inlet-outlet pipe for the recirculation system, which was the piece of the design that went underneath the concrete ring wall foundation, was approved "with the understanding that a complete engineering and design package for cathodic protection [and] internal mixing system will be provided prior to contract modification for this work." JX 51. This was, according to Contracting Officer Representative David Brady, "the only change needed for the foundation work of the tank to proceed." Tr. at 667; *see also id.* at 624 ("So what I was telling the contractor is I am approving this because I don't want to hold anything up. This is my understanding that this is the only change that needed to be made for the work to continue.").

Because the July 10 approval of the final soils analysis did not require any changes to the tank design, and the only design change affecting the tank foundation was approved by July 10, United could have begun installing the tank foundation at any time thereafter. Def.'s Proposed Findings at 22. Plaintiff concedes this point, but proffers another late-arriving argument in its post-trial response brief. Pl.'s Response at 6. Specifically, plaintiff contends that although the foundation could have been excavated, the erection of the tank itself could not proceed until the Forest Service had approved a change order and submittals relating to government alterations in the design of the aboveground portion of the tank. *Id.* As will become clear, this argument has no merit.

D.      *Completion of Work*

On May 22, 2006, United began work on the jack and bore project at Highway 89, which was complete before July 4 as requested by the California Department of Transportation.  Tr. at 363.  But Paso Robles had not yet begun digging the foundation for the water tank and could not have done so because the geotechnical report and the design change affecting the foundation had not been approved.  Thus, on June 26, Mr. Barnes sent a crew to the tank site to begin installing the 14" pipe, which continued for approximately three weeks.  *Id.* at 364.

As noted above, the foundation design and the geotechnical report were approved on July 10.  Paso Robles arrived on site to begin installing the ring wall foundation in late July— both Bud and Jim Barnes testified that it was "about three weeks" after June 26.  *Id.* at 114, 364; *see also* JX 96 at 2 (indicating tank work began on August 8).  Work therefore began on the tank foundation well before the September 6 signing of the contract change order, thus undercutting United's argument that it could not proceed with work before the Forest Service signed the change order.

However, the concrete trucks sent to pour the foundation were unable to climb the steep hill to the tank site or maneuver around a hairpin turn in the tank road.  Tr. at 365.  Mr. Barnes thus had to rebuild the road up to the tank site, while Paso Robles located trucks capable of accessing the site.  *Id.*; JX 138-A at 32, 39.  Work was suspended during this period.  Tr. at 365.

Paso Robles poured the ring wall foundation on August 17, 2006.  *Id.* at 415-16; JX 154-C.  The concrete required ten days to "cure" before the steel tank could be assembled, and thus the tank site had to sit essentially untouched until August 27.[12]

The full details of the cathodic protection and recirculation systems were approved by the Forest Service on Friday, August 25, 2006.  Tr. at 669-70; JX 123.  Paso Robles returned to begin assembling the prefabricated steel sections of the tank on the next work day, Monday, August 28, 2006.  JX 142 at 18.  Because the concrete was not ready for the erection of the tank until Sunday, August 27, there was no period of time when United was prepared to proceed with construction of the tank but was unable to do so because it was waiting for the Government to approve the design changes.

To allow the utility trenching to continue while the tank was being constructed, Jim Barnes had Paso Robles work on the tank from Monday through Thursday, and had his crew work on the trench from Friday through Sunday.  Tr. at 386.  On Friday, the trenching crew would re-excavate the trench and make other preparations; on Saturday, they would install as

_____

[12] Mr. Barnes originally testified that during the ten-day period while the concrete was curing, he continued to lay the 14" pipe.  Tr. at 365.  On cross-examination, however, Mr. Barnes acknowledged that United's payroll records showed his trenching crew was not on the project site the week of August 21 through 25, nor Monday through Wednesday of the following week.  Tr. at 418.  The crew returned to work that Thursday and worked through Saturday.  *Id.* at 418-19.

much pipe as possible; and on Sunday they would backfill the trench and bring the road back to grade so Paso Robles could access the tank site on Monday. *Id*. at 386-88. The project was "rendered extremely inefficient due to the need to maintain constant tank construction access." Pl.'s Proposed Findings at 17.

In building and rebuilding the tank access road for Paso Robles, United was contending with the large amount of rock excavated from the utility trench, which was stacked "in every accessible place that was there." Tr. at 366. Mr. Barnes and Mr. Brady agreed that United would place the large boulders along the roads of the campground as barriers, and a no-cost change order was issued to that effect. *Id*. at 366-67. Mr. Brady also asked Mr. Barnes "to get rid of these rocks" by "plac[ing] them along the side of the road as rock slope protection."[13] *Id*. at 368 (parenthetical added). United was paid for this rock slope protection by two change orders to bid item 02940(2), Rock Slope Protection. JX 122 at 2 ($45,000); JX 125 at 2 ($13,500).

In the ongoing dispute over payment for the "inexcavatable rock," the Government agreed with United that the 25 cubic yard estimate in the bid documents was too low, and increased the amount of "inexcavatable rock" on multiple occasions. Given its construction of the "inexcavatable rock" provision, however, the Government refused to make any additional payments for rock that was less than one-half cubic yard in volume. *See, e.g.*, JX 96 at 2 (noting that compensation for large boulders was increased "because of the bid item quantity being excessively low" but finding that "[a]s for the boulders and rock one-half cubic yard in volume or smaller, no additional compensation is forth coming [sic]"). But it was difficult to determine which rocks were more than one-half cubic yard. Tr. at 631, 681-84; JX 138-A at 53. Because the rocks were irregularly shaped, the controversy revolved, in part, around whether to measure the diameter of the rock and determine its volume as if it were a sphere, or to measure the length, width and height, measuring volume as if it the rock were a cube. Tr. at 135, 192-93. Due to the difficulty in measurement, Mr. Brady suggested a compromise solution, simply counting the large rocks and assigning each a volume of 3/4 cubic yard, a rough estimate assuming that 3/4 cubic yard was the average volume. JX 138-A at 73; Tr. at 681, 687-90. United would not agree to that procedure. JX 138-A at 73; Tr. at 681, 687-90. Jim Barnes suggested that a third party be brought in to measure the rocks, which Mr. Brady assented to "if they had a good verifiable method of measuring." JX 138-A at 53.

United brought in land surveyor Turner & Associates ("Turner") to measure boulders that were one-half cubic yard or larger. Tr. at 143, 370-71. Turner only measured those rocks that appeared to be close to one-half cubic yard in volume, thus "25 or 30 percent of the rocks . . . never got measured." *Id*. at 371. Turner then compiled lists of all the rocks that it measured, with separate totals for those boulders that were one-half cubic yard or larger. JX 74 at 3; Tr. at 194-95; 370-71. On October 12 and 19, 2006, Turner measured a total of 9,702 cubic feet of rock, but only 9,158 cubic feet were one-half cubic yard or larger; thus the survey included 544 cubic feet of rock (or 20.15 cubic yards) of boulders smaller than one-half cubic yard. JX 80 at 5; JX 74 at 5-10. Turner later surveyed the rock placed as slope protection at 20,732 cubic feet (or 767.86 cubic yards), though there is no representation that these rocks individually

---

[13] Rock slope protection is also referred to as rock riprap. *See* JX 1 at 155.

approached ½ cubic yard in size.[14]  JX 80 at 6; Tr. at 174.  United also asserted that 95.4 cubic yards of rock were sent to a local marina, Tr. at 175, but Turner's representative denied that they had conducted any survey at a marina.[15]  *Id.* at 202-03.  United thus claimed it was entitled to compensation for a total of 883.41 cubic yards of boulders slightly smaller than one-half cubic yard (20.15 + 767.86 + 95.4) at $225 per cubic yard for a total of $198,767.  JX 80 at 6.

United also complained that the Government had caused the delay in the installation of the tank by changing the design.  In response, the Forest Service asserted that "United Constructors was able to work on pipeline installation from May 15 to August 7, 2006, a total of 12 weeks, with no interference from the tank subcontractor."  JX 96 at 2.  Because United estimated that the utility trenching would take five weeks, it was the Government's position that United ought to have completed the trenching prior to the start of the tank installation and that "inadequate project management was a major reason this project [was] behind schedule and over running in [its] original estimated costs."  *Id.*  United took exception to this characterization.  JX 98 at 3.

Ultimately, the work was not completed in 2006, and United had to re-mobilize its equipment to finish the project in the spring of 2007.  *Id.*; JX 106 (indicating re-mobilization to begin April 30, 2007).  United submitted a request for equitable adjustment to the Forest Service on December 5, 2006, requesting $103,721 in additional compensation for "[a]dded [t]ime [r]equirements [d]ue [t]o [d]isrupted [s]chedules."[16]  JX 87.  The contracting officer denied this request and threatened to assess liquidated damages for late completion by letter on March 7, 2007.  JX 96 at 1, 3.

On March 22, 2007, United submitted certified claims in the amount of $198,767 for removal of rocks one-half cubic yard and smaller and $103,721 for delays associated with changes to the tank design.  *United Constructors, LLC v. United States*, No. 08-757, 2009 WL 875358, at *4 (Fed. Cl. Mar. 27, 2009) ("*United I*").  The Government did not respond to this

---

[14] As previously noted, the rock slope protection was paid for under a separate provision of the contract, bid item 02940(2).  JX 122; JX 125.  To determine the slope's size for payment, Turner simply measured the outside parameters of the rock slope and determined volume as if the entire slope were a solid sheet of rock, rather than measuring individual rocks.

[15] Mr. Brady testified that he believed some rock had been hauled down to the marina.  Tr. at 702.  There is no supporting documentation in the record for any such survey, nor any evidence whatsoever about the size of the individual rocks that may have been taken to the marina.

[16] The amount sought for "disrupted schedules" later increased to $118,865.87, JX 120 at 4, because United later added work done during weeks 25 and 26 of the project, the records for which were not available when the original claim was prepared.  *See, e.g.*, Pl's Proposed Findings at 18-19.  United asserts that it is entitled to be compensated for all labor, fuel and equipment costs associated with pipe installation incurred after July 31, 2006—the date that, in its estimation, it ought to have been done with pipe installation.  *Id.*

claim, resulting in a deemed denial.  *Id.* at *4-5 & n.2.  The final inspection occurred on July 13, 2007.  JX 111; Tr. at 389.

On August 10, 2007, United signed a contract release acknowledging receipt of a final payment of $17,123.00 and released the Forest Service from its obligations under the contract with the exception of five reservations, as follows:

> Reservation No. 1. All added costs sustained for "Rock Refill" as it pertains to all boulders and rocks ½ cubic yards in volumn [sic] and smaller.

> Reservation No. 2. All added costs sustained which resulted from a three-month government-caused delay when it took the government that long to approve the needed engineering and cost negotiations for the cathodic protection and needed circulation systems for the 480,000 [sic] gallon water storage tank that had been overlooked in the design stages for this project, and which caused both the tank crews and our crews to share the work site at the tank for a mojor [sic] period of time.

> Reservation No. 3.  All added costs sustained by us that were not included in Modification Number 7 [to the Contract] for having to remobilize this spring to complete work around the tank that could have been completed last fall had the government not opted to have the tank coated instead, even though the coating contractor had advised that their coatings could have easily waited until the spring of 2007.

> Reservation No. 4.  Other miscellaneous added costs that we have sustained in having to retain an attorney, and added costs we had to pay to hire an engineering firm to measure all boulders when the government would not accept our measurements.

> Reservation No. 5.  All justifiable time extensions.

Compl. ¶ 13; JX 113.  On March 27, 2009, the Court granted defendant's motion to dismiss the allegations of the complaint with respect to reservations three, four and five because they had not been properly presented to the contracting officer for decision. *United I*, 2009 WL 875358, at *8.  Only reservations one and two thus remained for trial, which was held on May 17-19, 2010 in Reno, Nevada.

## II.    Analysis

### A.       *Type I Differing Site Condition Claim*

With respect to compensation for boulders smaller than one-half cubic yard, United asserts a Type I differing site condition claim, which requires that the conditions encountered materially differ from those indicated in the contract documents.  *See* FAR § 52.236-2(a); *see also Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1376 (Fed. Cir. 2007) (differentiating Type I and Type II differing site condition claims).

In order to succeed on a Type I differing site condition claim, United must first show that "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348 (Fed. Cir. 2008); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984) ("A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be."). United must further demonstrate that "the actual site conditions were not reasonably foreseeable to the contractor, with the information available . . . outside the contract documents, i.e., that the contractor 'reasonably relied' on the representations." *Int'l Tech.*, 523 F.3d at 1349; *Renda Marine*, 509 F.3d at 1376 ("[T]he contractor must demonstrate that the conditions encountered were not reasonably foreseeable in light of all information available to the contractor when bidding [and] that the contractor reasonably relied upon its original interpretation of the contract. . . ."); *Foster Constr. C. A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 888 (Ct. Cl. 1970) ("The contractor is unable to rely on contract indications of the subsurface only where relatively simple inquiries might have revealed contrary conditions."); *see also Mojave Enters. v. United States*, 3 Cl. Ct. 353, 357 (1983) ("On the basis of the information available to it, plaintiff's pre-bid assumption that the plans depicted the 'rock work' (excavation and blasting) to be performed under the proposed contract in sufficient detail as to obviate any need for a site inspection (and to permit calculation of a bid without either site inspection or even any inquiry about site conditions) was an unwarranted and unreasonable one."). Third, United is required to prove that it in fact relied upon the representation in the contract. *Int'l Tech.*, 523 F.3d at 1349. Finally, United must show that it suffered damages as a result of the materially differing site conditions. *Id.*

What the contract indicated is a matter of law for the Court to decide, interpreting the contract from the point of view of a "reasonable and prudent contractor" in plaintiff's situation. *P.J. Maffei*, 732 F.2d at 917. The contractor does not need to show that its "interpretation of the contract is the *only* reasonable one, [but] it does bear the burden of showing that its construction is at least a reasonable reading." *Id.* The remaining matters—the foreseeability of the actual site conditions, reasonable reliance, and resulting damages—are questions of fact. *Int'l Tech.*, 523 F.3d at 1349.

        1.    <u>The Contract Made No Representation Regarding Rock Smaller than One-Half Cubic Yard</u>

United contends the estimate in the bid documents of 25 cubic yards of inexcavatable rock was "simply wrong" and "the actual amount of underground rock in the access road was more than ten (10) times that amount." Pl.'s Proposed Findings at 20. The Government contends that 25 cubic yards only represented "an idea that inexcavatable rock would be encountered," and the 25 cubic yards was "essentially a placeholder to make sure that the contractor considered the rock." Tr. at 487; *see also id.* at 540 ("[I]t is hard to estimate the exact quantity, and the idea of putting in a placeholder in there is to establish a unit price so we could make payment, whether it is higher and/or lower at a later time.").

But the amount of "inexcavatable rock," later defined by the contracting officer for the purposes of this contract as boulders exceeding one-half cubic yard in volume, is not the issue presented here. The question is whether the contract made *implied* representations regarding the

amount of rock *smaller* than one-half cubic yard in volume, but still "large."[17] The basis for a "Type 1 claim" is United's inference from the estimate of 25 cubic yards that "if the big [rocks] were only 1 or 2 percent of the total volume of excavations, those smaller would be insignificant also."[18] Tr. at 69.

United relies principally upon *Travelers Casualty & Surety Co. of America v. United States*, 75 Fed. Cl. 696, 712 (2007). Pl.'s Response at 2. In that case, the bid documents contained test pit logs that characterized the subsurface conditions as "easy digging" containing "few" cobbles. *Id.* at 715. The court held that the contractor reasonably believed that data "clearly implied cobble concentrations would be incidental." *Id.* at 720. Thus, the contractor was entitled to compensation for a differing site condition when the cobbles were more than incidental. *Id.* at 724.

Here, unlike *Travelers*, there is no indication in the contract that there were "few" rocks smaller than one-half cubic yard in the subsurface—the contract documents say nothing at all about rocks of that size. The contract only made an *express* representation regarding the amount of rock that would require removal by special methods such as blasting. JX 1 at 147. Technically there was *no* such rock because United concedes that it did no blasting.[19] Thus, the contract actually *over*estimated the amount of rock requiring removal by blasting or other extraordinary means. Nevertheless, the contracting officer exercised her discretion to pay for boulders larger than one-half cubic yard in volume. *See* Tr. at 617 (testimony of Contracting Officer Representative David Brady); *see also supra* note 6. As defendant points out, "United Constructors could not know that would happen and could not reasonably base its bid on this happening." Def.'s Proposed Findings at 13. Because the contract made no express representation regarding boulders larger than one-half cubic yard not removed by blasting, it would pile inference upon inference to find a second implied representation regarding boulders smaller than one-half cubic yard.

The bid documents made no representation regarding the quantity of smaller boulders. Thus, United assumed the risk that a significant amount of those boulders would be encountered.

---

[17] United's surveyor measured 359.33 cubic yards of boulders one-half cubic yards or larger. JX 80 at 3. United billed and was paid for 384 cubic yards of these large rocks. JX 140 at 30-31; JX 113. Payment for rocks larger than one-half cubic yard is not at issue in the case. *See* JX 113.

[18] The specifications permitted rocks smaller than three inches in diameter to be included in backfill material. JX 1 at 144. It is uncertain what the lower size limit of plaintiff's claim actually is; rocks of less than 10 inches in size were considered "no big deal." Tr. at 325-26. Mr. Barnes also argues that "25 to 30 percent" of the larger rocks were never measured and thus not compensated as inexcavatable rock. *Id.* at 374. This issue is not properly presented, however, because it was not set forth in any claim to the contracting officer.

[19] Mr. Brady criticized United for overexcavating the trench by removing all of the large boulders rather than drilling and blasting the rock in place. He stated that United's methodology slowed its progress and compounded the problem of disposing of excess rock. Tr. at 636-37.

If United was uncertain about the character of the subsurface conditions, it could have (1) investigated further to find data upon which to base its bid; (2) made assumptions, taking the risk those assumptions were incorrect; or (3) not bid.  United chose the second course of action, and further assumed subsurface conditions would be favorable, without building into its bid the risk that they might turn out to be unfavorable.  *Foster Constr.*, 435 F.2d at 887 (observing that where information is provided the contractor "may confidently rely" upon it and "need not include a contingency element in their bids.  Reliance is affirmatively desired by the Government, for if bidders feel they cannot rely, they will revert to the practice of increasing their bids.").  United cannot now undo its choice.

        2.      The Likelihood of Encountering Significant Subsurface Rock was
                    Reasonably Foreseeable

Even if the contract did make an implied representation, United would still have to show that "the actual site conditions were not reasonably foreseeable to the contractor, with the information available . . . outside the contract documents, *i.e.*, that the contractor 'reasonably relied' on the representations." *Int'l Tech.*, 523 F.3d at 1349.

United maintains that it would have gleaned no additional information from the site visit, relying on the testimony of surveyor Jeff Turner who testified that a surface observation did not allow him to "even begin to guesstimate or hazard a guess as to the nature o[r] the extent of the rock at the subsurface." Tr. at 206.  When Jim Barnes did visit the site, after the Forest Service's scheduled site walk, he observed various "rock croppings here and there" but "nothing within the work zone" (that is, immediately in the roadway, which was used as a horse trail). *Id.* at 320.  Jim Barnes thus felt that the 25 cubic yard estimate of inexcavatable rock "was low, but I didn't feel that it would be a lot more than the 15 percent off." *Id.* at 329.

David Brady, however, described the process of "surface classification," which is a manner of determining "the rock content of the anticipated excavation from looking at the surface." *Id.* at 714.  Mr. Brady observed the site after some surface reconditioning and grading had been done, and also reviewed photos of the site prior to any work being done. *Id.* at 715-16.  He testified that the amount of rock adjacent to the road "is a big indication of what subsurface excavation is going to be like" and there was no indication that "the material beneath the roadway is going to be any different than what I am looking at adjacent to the roadway." *Id.* at 718-19.  Based on his observations of the surface, he determined before trenching began that the subsurface was "probably 50 percent rock." *Id.* at 614-15.  After trenching began, Mr. Brady's contemporaneous notes contain an estimate that the subsurface was 70 percent rock.[20] JX 138-A at 9.

---

[20] United unsuccessfully argues that Mr. Brady's testimony actually supports its position, but simply mischaracterizes his testimony.  First, United argues that the amount of rock was not reasonably foreseeable because even Mr. Brady was "surprised" by the amount of rock.  Pl.'s Proposed Findings at 11.  But Mr. Brady's testimony was that he was surprised that United's bid did not seem to consider the amount of rock on the site:

Based upon the evidence presented at trial and the Court's visit to the construction site, the Court concludes that a reasonable and prudent contractor viewing the conditions on the surface would have foreseen a substantial likelihood of encountering significant amounts of subsurface rock in completing the contract.  Even Jim Barnes acknowledged that upon observing the site he knew that the estimate of 25 cubic yards of inexcavatable rock was "low."  Tr. at 329.  In submitting the bid he had prepared prior to viewing the site, Jim Barnes chose to (1) rely on observations of only the roadway, without regard to the land on either side; and (2) gamble that the estimate, though he believed it to be low, was not more than 15 percent off.  Mr. Brady's contemporaneous estimate, based on review of the entire site, that the material to be excavated was 50 percent rock turned out to be much closer to reality.[21]  Whatever assumptions Jim Barnes chose to make, they clearly differ from those of the other bidder, given that its per cubic yard rate was $2,480.  JX 9 at 3-4.  This other bidder's estimate is at least some evidence of what a reasonable contractor believed after reviewing the site and the bid documents.  Thus, United has failed to show that it reasonably relied upon any implied representation about the amount of rock smaller than one-half cubic yard.

---

So, when I walk a job, I am looking at how is the contractor going to be looking at this, and how would they bid it, so that I can make accurate cost estimates on behalf of the government.  I guess I was surprised that the amount of—it seemed like the amount of the high rock content of that site was not considered according to the contractor in their lump sum bid.

Tr. at 616; *see also* JX 46 at 2.  The record does not support United's repeated assertion that Mr. Brady was "surprised" at the high rock content encountered at the site.

In addition, United asks the Court to infer that because Jim Barnes did potholing before Mr. Brady looked at the site, Mr. Brady's estimate must have been based on observing the potholing.  Pl.'s Proposed Findings at 10 ("[T]he weight of the evidence is that Mr. Brady's conclusions were based upon these test pit excavations, not merely a surface evaluation."); *see also id.* at 11 ("[I]t is reasonable to conclude Mr. Brady at least knew of, and probably witnessed the potholing.").  But during trial United never asked Mr. Brady whether he observed the potholing, and there is no other evidentiary basis to make such a finding.  Without more, the Court declines to infer that Mr. Brady based his estimates on observing the potholing.

Finally, United contends that Mr. Brady testified "that he would not have concluded that there was 50% to 70% underground rock merely from the pre-construction photographs."  Pl.'s Proposed Findings at 11.  Although Mr. Brady testified that photograph 5 alone would not lead him to that conclusion, he also testified that considering the photographs as a whole he would conclude that there was 50% to 70% underground rock.  Tr. at 723-25; JX 154-B at 5 (photograph 5).

[21] United claims that Jim Barnes testified that "by all appearance the road had been constructed of fill many years earlier and only showed small rock which could be early [sic] dealt with."  Pl.'s Proposed Findings at 23.  The Court has been unable to find in the record any testimony about the road having been "constructed of fill."

United included the costs of excavating the utility trench in bid item 02610(2).  Tr. at
400-01.  According to United's method of pricing, the excavation, disposal of and backfill for
any rock not qualifying as "inexcavatable rock" was compensated as a service "incidental to
furnishing and installing a complete domestic water system as described."  JX 1 at 166 (bid item
02610(2)).  Because the contract contained no indication regarding the amount of rock smaller
than one-half cubic yard, and United could not have justifiably relied on any such representation
if it had been made, United is not entitled to additional compensation on its Type I differing site
condition claim.

B.    *Constructive Acceleration Claim*

It was not until plaintiff's responsive post-trial brief that it clarified its delay claim as one
of constructive acceleration.  Pl.'s Response at 5.  The test for a constructive acceleration claim
was set forth in *Fraser Construction Co. v. United States* as follows:

> Although different formulations have been used in setting forth the elements of
> constructive acceleration, the requirements are generally described to include the
> following elements, each of which must be proved by the contractor: (1) that the
> contractor encountered a delay that is excusable under the contract; (2) that the
> contractor made a timely and sufficient request for an extension of the contract
> schedule; (3) that the government denied the contractor's request for an extension
> or failed to act on it within a reasonable time; (4) that the government insisted on
> completion of the contract within a period shorter than the period to which the
> contractor would be entitled by taking into account the period of excusable delay,
> after which the contractor notified the government that it regarded the alleged
> order to accelerate as a constructive change in the contract; and (5) that the
> contractor was required to expend extra resources to compensate for the lost time
> and remain on schedule.  *See Norair Eng'g Corp. v. United States*, 229 Ct. Cl.
> 160, 666 F.2d 546, 548 (1981) (compressing these five requirements into three
> essential elements:  excusable delay, an order to accelerate, and acceleration with
> attendant costs).

384 F.3d 1354, 1361 (Fed. Cir. 2004) (citations omitted).

The general rule is that where both parties contribute to a delay, neither can recover
damages.  *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359-60 (Fed. Cir. 2002); *In re R.J.
Lanthier Co., Inc.*, ASBCA No. 51636, 04-1 BCA ¶ 32481, 2003 WL 22953681 (Dec. 9, 2003)
("When performance is, *arguendo*, 'delayed by multiple causes acting concurrently, and only
one cause is excusable, *i.e.*, where other causes lie with the contractor, courts and boards have
adopted the approach that neither party will benefit from the delay.  Consequently, in a
"Changes" clause analysis, a contractor cannot recover acceleration costs flowing from a
concurrent delay, unless the record supports a clear apportionment of the delay and expense
attributable to each party.'") (quoting *Appeal of Hemphill Contracting Co., Inc.*, ENGBCA No.
5840, 94-1 BCA ¶ 26491, 1993 WL 476309 (Nov. 12, 1993)).  *But see* W. Stephen Dale, &,
Robert M. D'Onofrio, *Reconciling Concurrency in Schedule Delay and Constructive
Acceleration*, 39 PUB. CONT. L.J. 161, 194, 227-28 (2010) (arguing that concurrent delays are

"excusable but not compensable" and entitle the contractor to more time; requiring the contractor to adhere to original schedule constitutes constructive acceleration).

United contends that it always planned to complete the utility trench after the tank was complete.  The tank was allegedly delayed by the design changes.  Pl.'s Proposed Findings at 24-25.  If United had been permitted to proceed on its own schedule, it asserts, it would have been done with the utility trench by July 31, 2006.  *Id.* at 26.  United thus reasons that it is owed compensation for labor, equipment and fuel costs spent to complete the utility trench after July 31.  *Id.*

The most important problem with this theory is United's contention that it "was prepared to start[]water tank construction in May of 2006." [22]  Pl.'s Proposed Findings at 27.  The evidence presented demonstrated that United knew it was required to complete a geotechnical report concluding that the soil would support a 420,000-gallon water tank before it could begin digging a foundation for the tank.  United's first attempt at that report was rejected in January 2006, and conditional approval obtained in February required United to perform a new investigation "as soon as possible in the Spring of 2006."  JX 28.

Because the tank design could not be approved until the soil investigation was complete, United could not have dug the foundation for the tank in May of 2006.  In fact, United did not even dig for the second soil test until May 30, 2006, and did not complete the required soil analysis until June 30.  Even after the soil test was complete, United waited another week to forward it to the Forest Service, which approved it three days later, on July 10, 2006.  JX 49; JX 54 at 2.

And because it had not complied with the geotechnical report requirement, United could not have begun to dig the foundation for the tank until July 10, 2006, which is the same date that the Forest Service approved the only change to the design of the tank that affected the foundation.  JX 51.  Due to its own delays in completing the geotechnical report, United's contention that it was prepared to proceed with the tank construction in May of 2006 is simply not supported by the evidence.  *Cf.* Pl.'s Response at 6 ("[United's] work would not have been impacted had the [Forest Service] granted a time extension and the tank access road pipe work could have been performed as planned *after* the water storage tank had been constructed.") (emphasis in original).

United's schedules indicate that it planned to have the utility trench completed by the middle to end of July, and as it turned out, the tank work did not begin until August.  *See* JX 132 at 2; JX 134 at 3; JX 135 at 2; JX 136 at 2; *see also* JX 96 at 2 (indicating tank work began on August 8).  If United had complied with its own planned schedule, despite the delays resulting from the geotechnical report and the design changes, the utility trench would have been

---

[22] Other problems include United's mischaracterizations of its schedules as "never" contemplating the installation of the tank and the trench at the same time.  The original plan was clearly to install the ring wall for the tank and to complete the utility trench in the same fifteen days.  JX 6 at 24; JX 10 at 2.

completed before the installation of the tank, and there would have been no need for the two activities to occur simultaneously.

To the extent that the concurrent delay caused by the Government's re-design entitled United to more time to construct the tank, United received that time.  The contract modification approving the final design changes and the payment for the re-design also increased the contract time by 15 days.  JX 123 at 2.  United failed to show that this increase was insufficient to compensate for the excusable portion of the delay arising from the Government's actions; as per the usual rule, United received time, but not money, as a result of the concurrent delay.  *Id.*; Def.'s Response at 11.  It was United's own delays and decisions regarding the manner of proceeding with the work and use of time that caused the overlapping erection of the tank and the utility trench.  United therefore failed to prove entitlement to an equitable adjustment for constructive acceleration.

## CONCLUSION

Because United is not entitled to compensation on either of its theories, the Clerk is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

 s/ George W. Miller
GEORGE W. MILLER
Judge